FILED
2021 Dec-07  AM 11:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| MARK REED, Administrator of the Estate and personal representative of Madison Reed, deceased, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 7:19-cv-01596-LSC |
| | ) | |
| TRACKER MARINE, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OF OPINION

Before the Court are Defendants' Mercury Marine, a division of Brunswick Corporation, and Brunswick Corporation (jointly referred to as "Mercury Marine" or "Mercury") and Tracker Marine, LLC ("Tracker") (collectively "Defendants") motions for summary judgment (docs. 40 and 42). Also before the Court is Tracker's motion to exclude Plaintiff's expert witnesses. (Doc. 54.) The motions have been briefed and are ripe for review. For the reasons stated below, Defendants' motions are granted in part and denied in part: Tracker's motion to exclude Mr. Keith Jackson is GRANTED, but its motion to exclude Dr. Brandon Taravella is DENIED; Mercury's motion for summary judgment is GRANTED as to claims alleging failure

1

to warn and breach of implied warranties and DENIED as to defective design claims arising under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD") and negligence and wantonness; Tracker's motion for summary judgment is granted as to Plaintiff's claims alleging attractive nuisance and breach of implied warranties and DENIED as to claims for failure to warn, negligence and wantonness, and defective design under the AEMLD.

## I.   BACKGROUND[1]

This case arises from a boating accident (the "Accident") on August 26, 2017, in which fourteen-year-old Madison Reed fell from the bow of a pontoon boat, a Sun Tracker Party Barge 20 (the "Vessel"), and subsequently struck the propeller of the 60-horsepower outboard motor (the "Engine"), resulting in her death. (Doc. 1-1 at 7-8.) Plaintiff Mark Reed is Madison Reed's father, as well as the administrator and personal representative of her estate. (Doc 1-1 at 6, Doc. 41-1 at 496.) He filed suit on August 26, 2019, in the Circuit Court of Tuscaloosa, Alabama. (Doc. 1-1 at 2-3.)

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994). The Court is not required to identify unreferenced evidence supporting a party's position. As such, review is limited to exhibits and specific portions of the exhibits specifically cited by the parties. *See Chavez v. Sec'y Fla. Dept. of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record . . . .")

The complaint included allegations of defective design, failure to warn, negligent design, and breach of warranty claims against Tracker, the manufacturer of the Vessel, and Mercury Marine, the manufacturer of the Engine, as well as an attractive nuisance claim against Tracker. (Doc. 1-1.) On September 27, 2019, Mercury Marine filed a notice of removal with this Court. (Doc. 1.)

Rhonda McCostlin originally purchased the Vessel with the attached Engine from Bass Pro Shop in Leeds, Alabama, on June 12, 2010. (Doc. 41-1 at 20, 22.) At the time of the accident, Dorothy Kornegay (also known as "Marie") owned the Vessel, (*id.* at 32), but her son-in-law, Daniel Jones, was the primary operator (*id.* at 48). On the day of the accident, Daniel Jones and his wife Michelle (also known as "Shelly") took their daughter Kaitlyn, and her teenage friends, Madison Reed, Ricki Smith, Carson Hunnicutt, and Tanner Dawson (collectively, the "Teenagers") out in the Vessel on Ski Lake. (Doc. 41-1 at 135.)

At some point during the afternoon, Madison Reed and several of the other Teenagers moved to sit on the unenclosed bow deck of the Vessel while it was underway. (Doc. 41-1 at 78.) Daniel and Shelly Jones were aware that the Teenagers were on the bow deck and permitted them to remain there, even though it was against their customary rules. (*Id.* at 137.) Immediately before the Accident, Madison Reed

3

was sitting on the floor of the unenclosed bow platform. (*Id.* at 86, 136, 214-215.)

There is some dispute as to what exactly caused Ms. Reed to fall into the water, but Carson Hunnicutt admits that he made a hand motion towards Ms. Reed and "acted like [he] was going to hit her." (*Id.* at 218.) Ms. Reed reacted, lost her balance, and fell in the water. (*Id.*) The other Teenagers began yelling for Daniel Jones to stop the boat, which was in gear at the time of Madison Reed's fall. (*Id.* at 83, 152.) Madison Reed was seen briefly floating facedown behind the boat. (*Id.*) Even though Daniel Jones and Carson Hunnicutt jumped in after her, her body was not recovered until divers discovered her later that evening. (*Id.* at 83, 234) Dr. Stephen Boudreau with the Alabama Department of Forensic Science concluded that Madison Reed died of blunt force trauma and drowning. (*Id.* at 254, 258.)

## II.    STANDARDS OF REVIEW

### A. Tracker's Motion to Exclude Expert Testimony

While Federal Rules of Evidence 401 and 402 provide for the liberal admission of relevant evidence, Rules 403, 702, and 703 mitigate against this general policy by giving trial courts discretion to exclude unreliable or irrelevant expert testimony. *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1310 (11th Cir. 1999). The Eleventh Circuit summarized the applicable rules in *City of Tuscaloosa v. Harcross Chem., Inc.*,

4

158 F.3d 548, 562 (11th Cir. 1998), when it wrote that scientific expert testimony may be admissible if "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *See also, e.g.*, *Allison*, 184 F.3d at 1309; *Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1312 (11th Cir. 2000).

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court imposed a special duty on trial judges pursuant to Federal Rule of Evidence 702, requiring judges to act as "gate-keepers" to ensure that novel scientific evidence is both reliable and relevant before it is admitted. Later, in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court expanded its *Daubert* ruling. The Supreme Court recognized that judges are not trained scientists and that the task imposed by *Daubert* is difficult in light of their comparative lack of expertise. *Allison*, 184 F.3d at 1310 (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 148 (1997) (Breyer, J. concurring)). Nevertheless, the judge's relatively inexpert attention is preferable to "dumping a barrage of questionable scientific evidence on

5

a jury." *Id*. While this Court is aware of its duty as a gatekeeper, it understands that its role is "not intended to supplant the adversary system or the role of the jury," *Id*. at 1311, and it recognizes that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

The primary focus of a *Daubert* inquiry is on the principles and methodology underlying expert opinion testimony, not the conclusions they generate. *Id*. at 595. The trial court must be sure the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. While experience alone may qualify an expert witness, it is not always enough. *See United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004). "If the witness is relying solely or primarily on experience, then the witness must explain how the experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id*. (quoting Fed. R. Evid. 702 advisory committee's note (2000 amends.)). Accordingly, "the proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence,

6

it is reliable." *Allison*, 184 F.3d at 1312; *see also Joiner*, 522 U.S. at 146 ("[C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *Daubert*, 509 U.S. at 589–90 (Rule 702 requires that the subject of an expert's testimony must be "knowledge," which connotes more than a subjective belief or unsupported speculation).

*Daubert* also requires a special inquiry into relevance, calling on the trial court to ensure expert testimony "logically advances a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharmaceuticals*, 43 F.3d 1311, 1315 (9th Cir. 1995) (on remand). There must be a valid scientific connection between the testimony and the disputed facts in the case. *Id*. Furthermore, when expert opinion is based on otherwise inadmissible hearsay, Rule 703 requires the trial court to ensure the underlying facts or data upon which the expert bases his opinion or inference are of the type reasonably relied upon by experts in the particular field.

The testimony must assist the trier of fact to understand the evidence or to

determine a fact in issue through the application of scientific, technical, or specialized expertise. *City of Tuscaloosa*, 158 F.3d at 562. The expert must contribute specialized knowledge not within the general understanding of the jury nor anything the lawyers could argue to the jury themselves. *Cook ex. rel Estate of Tressier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005). Furthermore, the burden is on the party offering the expert testimony to affirmatively establish that their expert has suitable qualifications. *See*, *e.g.*, *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004).

## B. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact[2] and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth*

---

[2] A material fact is one that "might affect the outcome of the case." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015).

*Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge should not weigh the evidence but should determine whether there are any genuine issues of fact that should be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In considering a motion for summary judgment, trial courts must give deference to the nonmoving party by "view[ing] the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Conclusory allegations and a "mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (per curiam) (quoting *Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004)). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving

party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013) (per curiam). Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## III.   DISCUSSION

As a preliminary matter, the Court must address Defendant Tracker's Motion to Exclude the Expert Testimony of Keith Jackson and Brandon Taravella (doc. 54) as it will possibly be dispositive of Tracker's motion for summary judgment (doc 42.)

### A.  TRACKER'S MOTION TO EXCLUDE EXPERT WITNESSES

Tracker argues that the respective testimony of Mr. Keith Jackson and Dr. Brandon Taravella does not meet the standard set forth by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579 (1993). Rule 702 provides that a:

> witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> > (b) the testimony is based on sufficient facts or data;
> > (c) the testimony is the product of reliable principles and

10

methods; and

(d)   the expert has reliably applied the principles and methods
to the facts of the case.

Fed. R. Evid. 702. For expert testimony to be considered reliable, "the reasoning or

methodology underlying the testimony [must be] scientifically valid" and must be

"properly . . . applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. Under

*Daubert*, the Court′s inquiry is flexible, but the focus "must be solely on principles

and methodology, not on the conclusions that they generate.″ 509 U.S. at 594-595.

When assessing the reliability of an expert's testimony, the Court should consider

four factors: (1) whether the expert's theory can and has been tested, (2) whether

the theory has been subject to peer review and publication, (3) whether the known

or potential rate of error of the methodology is acceptable, and (4) whether the theory

is generally accepted in the scientific community. *McDowell v. Brown*, 392 F.3d 1283,

1298 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 593–94). Ultimately, however,

"[v]igorous cross-examination, presentation of contrary evidence, and careful

instruction on the burden of proof are the traditional and appropriate means of

attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (1993).

### 1.  Mr. Jackson's Testimony

Tracker argues that Mr. Jackson's opinions as to Tracker's design and

11

warnings for the subject Vessel should be excluded because he admitted in deposition that he is not qualified to offer them. (Doc. 55 at 7-8.) This Court has previously excluded expert testimony when the witness is "by his own admission unqualified to testify" on the issue. *Day, LLC v. Plantation Pipe Line Co.*, 315 F. Supp. 3d 1219, 1228 (N.D. Ala. 2018).

Mr. Jackson's report included opinions regarding the Vessel, such as his determination that the Vessel "has several hazardous design flaws and was not manufactured to industry standards at the time of production" and "[o]n board warning placards are conflicting and do not meet industry standards at the time of production." (Doc. 41-1 at 384.) In his deposition testimony, however, Mr. Jackson admitted that he was not an expert on warning labels or on the opinions he offered in relation to the Vessel in his report. (Jackson Depo. 177.) He further acknowledged that he did not intend to offer an opinion against Tracker at trial. (*Id.* at 178.)

> Q. ... Would you agree with me then, given the fact that you're not a naval architect, you're not an expert in warning labels, that you're not really holding yourself out as an expert to offer the opinions in numbers one through three on Page ... 6 of your report?...
> A. That would be correct.
> Q. Okay
> [Objection omitted.]
> Q. So in light of that testimony and what you've just told me, I don't believe I have any further questions of you because it doesn't sound like

you're going to be offering an opinion against Tracker Marine at the
time of trial?
[Objection omitted.]
A. That would be correct.

(Doc. 41-1 at 376.) Accordingly, this Court agrees that Mr. Jackson's testimony is

not admissible against Tracker.[3]

## 2. Dr. Taravella's Testimony

Tracker argues that Dr. Taravella's opinions should be excluded in their

entirety because he is not qualified, he did not review material facts, his

methodology is no more than "a conclusion-driven *ipse dixit*," and his opinions will

not assist the trier of fact. (Doc. 55 at 11.)

## a. Dr. Taravella's Qualifications

Dr. Brandon Taravella is a naval architect and marine engineer. (Doc. 41-1 at

387.) He earned his doctorate degree in engineering and applied science with a

concentration in naval architecture and marine engineering at the University of

New Orleans, where he now serves as a professor. (Doc. 41-1 at 289, 297, Doc. 57

---

[3] This Court's decision to exclude Mr. Jackson's testimony against Tracker has no bearing on
whether Mr. Jackson is qualified to testify as an expert against Mercury Marine, which only
recently filed a motion in limine to exclude Mr. Jackson as an expert witness (doc. 61). As the
Plaintiff has not yet had an opportunity to respond to that motion, the Court does not consider that
motion here.

at 13.) He teaches a course in planning hydrodynamics and has authored papers on the same subject. (Doc. 41-1 at 297.) He and his business partner have a company that offers consulting services in the areas of naval architecture, marine engineering, vessel structural analysis, vessel modifications, and other services. (*Id.* at 292.) He has served as an expert in at least seven other cases. (*See id.* at 294-95.)

Tracker argues that Dr. Taravella's experience has primarily been "focused on the hydrodynamic and performance aspects of commercial boats – not safety designs of a recreational pontoon." (Doc. 55 at 11, citing Doc. 41-1 at 297-99.) Tracker also notes that Dr. Taravella has never testified in a case involving a recreational pontoon boat and has only operated a recreational pontoon once before. (Doc. 55, citing Doc. 41-1 at 292-93, 295, 299.) Nor has Dr. Taravella been certified in the design of recreational boats by a manufacturer. (Doc. 41-1 at 299.) While he has worked with Sterling Marine on the design of a pontoon boat, that design was for a commercial pontoon. (*Id.*) Tracker notes that Dr. Taravella has never been a member of the American Boat and Yacht Council ("ABYC") or the National Marine Manufacturers Association ("NMMA"). (*Id.* at 292.) Nor has he received any training on warnings required on recreational vessels. (*Id.* at 297.)

Despite Tracker's assertions that Dr. Taravella is unqualified to render an

expert opinion in this case, the Court finds that Dr. Taravella's education, training, and experience provide him with a level of expertise about the design of the Vessel and possible alternatives to make his opinion useful in this case. Dr. Taravella has worked on pontoon boats before, and he testified that he has over one hundred hours of experience in recreational boating. (*Id.* at 302.) Neither *Daubert* nor Rule 702 require any specific number of similar investigations for a witness to be considered an expert. Dr. Taravella has been educated in naval architecture and marine engineering, and he now instructs others. (*Id.* at 289, 297, Doc. 57 at 13.) Because Dr. Taravella has special education and training in areas relevant to this case, he is qualified to testify as an expert.

### b. Reliability of Dr. Taravella's Methodology

Tracker argues that Dr. Taravella should be excluded because he did not review some material facts before authoring his report and because his methodology is pure *ipse dixit*, which is not admissible. (Doc. 55 at 11-19.)

Tracker cites *Haney v. Eaton Elec., Inc.*, 528 F. Supp. 2d 1262 (N.D. Ala. 2007), as support for its argument that Dr. Taravella's failure to familiarize himself with the material facts prevents him from offering a reliable opinion. (Doc. 55 at 11.) Tracker suggests that the expert in *Haney* was excluded because he did not perform

15

relevant testing or review drawings of the allegedly defective product. (*Id.*) In fact, this Court's decision to exclude the opinion was based on the expert's "lack of certainty, examination, and testing; his inability to explain how heat actually affected the relays in question in terms of their particular engineering and design; and his concession that he would not design the relays any differently." *Id.* at 1268.

Tracker points to the fact that Plaintiff had not issued any written discovery requests or subpoenas for records or conducted any depositions before Dr. Taravella authored his report as evidence that Dr. Taravella did not consider material evidence in forming his opinions. (Doc. 55 at 12.) Dr. Taravella's report indicates that he reviewed the police accident report, the autopsy report, photographs from the autopsy and the Vessel, and relevant ABYC standards. (Doc. 41-1 at 387.) Dr. Taravella also personally inspected the Vessel at the home of Ms. Kornegay in February 2021. (*Id.* at 308, 387.) Tracker also notes Dr. Taravella's admission that he wished he had more time to perform testing of the Vessel and his agreement with the suggestion that an expert needs to fully understand the facts before offering an opinion. (Doc. 41-1 at 295-96.) Dr. Taravella also stated, however, "I believe I had enough information to render the opinions that were given." (*Id.* at 295.) He reiterated this point when questioned again, "… I think I

16

had enough facts to comment on what some of the issues were with the design. I believe those facts were present." (*Id.* at 326.)

Tracker's argument that Dr. Taravella's opinion should be excluded because he did not consider certain material facts in forming his conclusions fails. The admissibility of Dr. Taravella's testimony does not hinge on whether all of the information is known. The Eleventh Circuit has stated:

> It is true that relevant testimony from a qualified expert is admissible only if the expert knows of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation. However, absolute certainty is not required. Expert testimony is admissible which connects conditions existing later to those existing earlier provided the connection is concluded logically. Whether this logical basis has been established is within the discretion of the trial judge and the weaknesses in the underpinnings of the expert's opinion go to its weight rather than its admissibility. On cross-examination, the opposing counsel is given the opportunity to ferret out the opinion's weaknesses to ensure the jury properly evaluates the testimony's weight and credibility.

*Jones v. Otis Elevator Co.*, 861 F.2d 655, 662–63 (11th Cir. 1988) (citations omitted). Dr. Taravella's testimony needs to be connected logically to the conditions and evidence. As discussed above, Dr. Taravella reviewed reports, examined the Vessel and relevant photographs, and applied his professional judgment to reach a logical conclusion based on this evidence. (Doc 41-1 at 387.) Dr. Taravella had a logical basis for forming his opinion and any supposed shortcomings may be addressed by

17

opposing counsel on cross-examination.

Furthermore, Dr. Taravella's testimony concerns the design of the Vessel and whether that design was defective. In contrast to the expert in *Haney*, he examined the Vessel as well as the accident and autopsy reports. He also reviewed photos and relevant ABYC standards. He expressed a level of confidence in his conclusions and in his proposals for alternative designs that the expert in *Haney* lacked. Accordingly, his opinions are sufficiently reliable.

Tracker also asserts that Dr. Taravella's methodology was pure *ipse dixit* and should be excluded as a result. Tracker asserts that Dr. Taravella's report is "critically lacking in **any** explanation of methodology, analysis, empirical data, or studies to support the conclusion that the Vessel was defective or somehow to blame for the Accident." (Doc. 55 at 19.) In rebuttal, Plaintiff argues that Dr. Taravella's knowledge and experience provide the necessary basis for his conclusion, which does not need to establish the entirety of Plaintiff's case but merely provide a piece of the puzzle to be determined by the trier of fact. (Doc. 57 a 16-17.)

This Court must consider "whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology

18

properly can be applied to the facts in issue." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) (quoting *Daubert*, 509 U.S. at 593-94). In *Adams v. Lab'y Corp. of Am.*, the Eleventh Circuit determined that an expert witness's "methodology" was reliable, even though the concurring opinion questioned whether the witness's methodology was anything more than the mere exercise of professional judgment. *Adams v. Lab'y Corp. of Am.*, 760 F.3d 1322 (11th Cir. 2014). The court stated, "In using the terminology of methodology we are referring to the manner in which Dr. Rosenthal reviewed the slides, applied her medical knowledge and experience …, and formed her opinion. Whether her approach is called a 'methodology' or simply 'application of professional judgment' does not matter." *Id.* at 1331 n.13. The court elaborated further, "Whatever the terminology, the approach is subject to a reliability inquiry. … [E]ven in cases where the reliability determination turns primarily on an expert's experience, 'the district court must still determine the reliability of the opinion, not merely the qualifications of the expert who offers it.'" *Id.* (quoting *Kilpatrick,* 613 F.3d at 1336).

Much like the doctor in *Adams*, Dr. Taravella reviewed the evidence available at the time he authored his report, applied his knowledge and experience as a naval architect and marine engineer, and formed his opinion. Dr. Taravella testified in his

deposition that his methodology consisted of "past experience of empirical data from boats of similar size, as well as, ... [his] stud[y of] the photographs, what [he] knew about the engine and its RPM and the gear ratio." (Doc. 41-1 at 296.) Dr. Taravella also explained how he arrived at his estimate of the Vessel's speed at the time of the accident, noting how he was able to "back into what the speed of the boat is" based on other available information, such as the blade rate frequency, the measurements of wounds on Ms. Reed's body, and the gear ratio. (Doc. 41-1 at 291.)

This Court finds that Dr. Taravella's methodology was reliable because he provided a reasonable explanation for his application of his professional knowledge and judgment to the facts in this case.

### c. Assists the Trier of Fact

Tracker's final argument to exclude Dr. Taravella's opinions insists that they are unhelpful to the jury because they are irrelevant and offer nothing more than the understanding of a lay person. (Doc. 55 at 19-20.)

Tracker refashions its earlier argument concerning Dr. Taravella's failure to examine certain evidence as a reason his opinions should be considered irrelevant. (Doc. 55 at 20-23.) As an example, Tracker argues that Dr. Taravella's opinion that the Vessel did not comply with ABYC standards was irrelevant because he did not

examine the owner's manual for the Vessel to recognize that the regulation did not apply to the facts in this case. (Doc. 55 at 24-25.) Dr. Taravella's report alleged, among other things, that the Vessel violated ABYC Standard H-41, which requires handhold devices "in exterior seating locations intended to be occupied with [sic] the vessel is underway." (Doc. 41-1 at 392.) Tracker argues that Dr. Taravella's opinion is irrelevant because the owner's manual and other warnings alert users to the dangers of using the bow deck and fishing chairs when the Vessel is underway and instructing them not to use them in that fashion. (Doc. 55 at 24-25.) Dr. Taravella's report, however, notes that the ABYC definition for "underway" includes a vessel that is "not at anchor, or held fast to the shore, or aground" (doc. 41-1 at 392), and in his deposition testimony, he explained his concern that the bow deck and fishing chairs could be used when the boat was not at anchor or while trolling (doc. 41-1 at 315). Dr. Taravella was raising the concern that, despite warnings to the contrary, the design of the boat allowed for use of the Vessel in a way that violated ABYC safety standards.

Tracker cites this Court's analysis in *Davis v. BellSouth Telecommunications, Inc.*, "When an expert's conclusions are based upon regulations, those regulations must be applicable to that facts at hand. Otherwise, when the violation of the

regulation is the sole basis for the expert opinion, it will not assist that trier of fact." 7:10-CV-02851-LSC, 2012 WL 3637762, at *4 (N.D. Ala. Aug. 16, 2012). Tracker argues that Dr. Taravella's opinion about the regulation does not apply to these facts because the warnings indicate that Tracker did not intend for the bow deck to be used while the Vessel was underway. (Doc. 55 at 24-25.) Dr. Taravella's opinion is relevant because the boat was underway at the time of the Accident, and furthermore, his opinion about the Vessel is not solely based on the violation of the regulation.

Dr. Taravella's testimony considers whether the Vessel was unreasonably dangerous and alternative designs that he claims were safer, practical, and available to Tracker at the time the Vessel was manufactured. (Doc. 41-1 at 387-94.) Such testimony strikes at the very question the trier of fact must determine to resolve this case. As discussed further below regarding Tracker's motion for summary judgment, this Court believes a triable issue of fact remains for the jury on these issues. As such, Dr. Taravella's testimony is relevant to the remaining issues.

Tracker further argues that Dr. Taravella's opinions are so obvious that they are unhelpful. In order to reach a determination about the issues in this case, the jury will have to decide whether the Vessel was unreasonably dangerous, including

whether a safer, practical, alternative design was available. Dr. Taravella offers an opinion about such designs and whether they are safer and practical given his training and experience as a naval architect and marine engineer. This Court does not presume that laypersons on the jury will possess such knowledge or experience. In particular, a jury tasked with determining whether a particular alternative was practical would likely benefit from the testimony of someone who has actually designed and built boats. The Court rejects Tracker's argument that Dr. Taravella's testimony is unhelpful to the jury. Accordingly, Tracker's motion to exclude Dr. Taravella's testimony is denied.

## B.  MERCURY MARINE'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs have brought claims against Mercury Marine under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD") alleging that the Engine was unreasonably dangerous and that Mercury failed to provide adequate warning and to equip the Engine with an available safety device. (Doc. 1-1 at 4-12.) The complaint also sets forth claims against Mercury Marine for negligence and wantonness for the same conduct, and breach of implied warranties of merchantability and fitness for a particular purpose. (*Id.*) Defendant Mercury Marine has moved for summary judgment on all claims. (Doc. 40.)

### 1. Plaintiff's Negligence and Wantonness, Failure to Warn, and Breach of Warranty Claims

As a preliminary matter, the Court addresses Mercury Marine's assertion that Plaintiff has conceded the negligence and wantonness, failure to warn, and breach of warranty claims alleged against Mercury Marine. "Summary judgment is appropriate where the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is *no genuine issue as to any material fact* and that the moving party is entitled to judgment as a matter of law.'" *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004) (quoting Fed. R. Civ. P. 56(c)). As a result, summary judgment may not be granted simply because a motion was unopposed. The court must consider the merits by "ensur[ing] that the motion itself is supported by evidentiary materials." *Id.*

### a. Negligence and Wantonness

Plaintiff disputes the reasoning in Mercury Marine's brief in support of summary judgment on the issue of negligence and wantonness but ultimately "agrees that his claim against Mercury is based on the AEMLD." (Doc. 48 at 15.) Some overlap exists in AEMLD and negligence claims, but courts have held that the development of the judicially created AEMLD did not subsume claims of negligence

24

and wantonness. *Spain v. Brown & Williamson Tobacco Corp.*, 872 So. 2d 101, 106 (Ala. 2003). Under the AEMLD, "the fault or negligence of the defendant is that he has conducted himself in a negligent manner by placing a product on the market causing personal injury or property damage, when used to its intended purpose." *Casrell v. Altec Industries, Inc.*, 335 So.2d 128, 132 (Ala. 1976).

While Plaintiff's complaint does not specify which claims are brought under the AEMLD, Counts Three and Four allege that the Engine was "unreasonably dangerous when put to its intended use." (Doc. 1-1 at 10-11.) Count Five, however, alleges that the defendants "negligently and/or wantonly manufactured, assembled, designed, sold, and otherwise placed into the stream of commerce a product in a defective condition." (*Id.* at 12.) While the Alabama Supreme Court suggests that best practice is to state in the complaint that the claim is brought under the AEMLD, setting forth the elements will suffice. *Casrell*, 335 So.2d at 132-33 n.1.  Because Plaintiff did not identify the AEMLD as the basis for Counts Three and Four against Mercury Marine, the Court considers the statement in Plaintiff's response admitting that his claim against Mercury Marine was based on the AEMLD to be a clarification that Counts Three and Four were asserted under the AEMLD, rather than an abandonment of his claims for negligence and wantonness as asserted in Count Five.

For this reason, the Court finds that Plaintiff did not concede his claim for negligence and wantonness.

Because the Plaintiff's claim for negligence and wantonness in the complaint was based on an allegation that Mercury Marine placed a defective product into the stream of commerce and because virtually the same principles apply under the AEMLD and negligence, *Elliott*, 903 F.2d at 1506, the Court denies Mercury Marine's motion for summary judgment on these claims for the reasons stated in its discussion of the AEMLD claim below.

### b. Failure to Warn

Regarding the failure to warn claim, Plaintiff suggests that a warning placard located on the Engine indicated that Mercury Marine knew of the intended application of the Engine to a pontoon boat. (Doc. 48 at 16.) Plaintiff's brief acknowledges, and the evidence available at this stage confirms, a placard on the Engine alerting the consumer to a requirement for a special propeller and advising the consumer to consult the operation manual or the dealer. (Docs. 41-1 at 383, 48 at 16.) Specifically, the warning read, "IMPORTANT Special Propellers required! Consult Operation Manual or Dealer for details." (Doc. 41-1 at 383.) Plaintiff further admits that "the duty to further adequately warn of the hazards of its boat, so

26

equipped, rests with Tracker in the instant action." (Doc. 48 at 16.) Because Plaintiff concedes that Mercury Marine fulfilled its duty to warn, and the evidence available at this stage supports that concession, Plaintiff has conceded this claim, and the Court grants summary judgment on this issue.

### c. Breach of Implied Warranties

Concerning the claim for breach of the implied warranties of merchantability and fitness for a particular purpose, Plaintiff also agreed "that under Alabama law no such implied warranties apply to a 'used' product." (*Id.*) The Supreme Court of Alabama has held that only sellers, not manufacturers, are subject to implied warranties under its version of the UCC. *Ex parte Gen. Motors Corp.*, 769 So. 2d 903, 910 (Ala. 1999) (finding that summary judgment would be proper as to breach of the implied warranties of merchantability and fitness for a particular purpose against the manufacturer of the vehicle where the plaintiff sustained physical injuries and damage to his automobile). Because there is no dispute that Mercury Marine is the manufacturer, not the seller, of the Engine in this case, the Court agrees that neither the implied warranty of merchantability nor the implied warranty of fitness for a particular purpose applies in this case. Further, Plaintiff conceded this point. (Doc. 48 at 16.) Accordingly, Mercury Marine is entitled to summary judgment on the

27

claims asserting breach of implied warranty.

### 2. AEMLD

Under the AEMLD, a plaintiff establishes liability by showing:

(1) he suffered injury or damages to himself or his property by one who sells a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if
> (a) the seller is engaged in the business of selling such a product, and
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) Showing these elements, the plaintiff has proved a prima facie case although
> (a) the seller has exercised all possible care in the preparation and sale of his product, and
> (b) the user or consumer has not bought the product from, or entered into any contractual relation with, the seller.

*Casrell*, 335 So. 2d 128, 132–33. Stated differently, "a defendant will be liable … if it manufactures, designs, or sells an unreasonably dangerous product that reaches the consumer substantially unaltered and, because of its unreasonably dangerous condition, injures the consumer when put to its intended use." *Beam v. Tramco, Inc.*, 655 So. 2d 979, 981 (Ala. 1995). A product that is unreasonably dangerous is "one that is not fit for its intended purpose or that does not meet the reasonable expectations of the ordinary consumer." *Id.* An ordinary consumer is an "objective 'ordinary consumer,' possessed of the ordinary knowledge common to the

28

community." *Garrison v. Sturm, Ruger & Co., Inc.*, 322 F. Supp. 3d 1217, 1224 (N.D. Ala. 2018) (quoting *Deere & Co. v. Grose*, 586 So.2d 196, 198 (Ala. 1991)) (citing *Tillman v. R.J. Reynolds Tobacco. Co.*, 871 So.2d 28, 32 (Ala. 2003)). "The manufacturer of a product is not required to produce the safest possible product, but only to produce a product that is reasonably safe when put to its intended use." *Graham v. Sprout-Waldron and Co.*, 657 So.2d 868, 870 (Ala. 1995).

Furthermore, the plaintiff must also show that a safer alternative design existed in order to demonstrate the defectiveness of the allegedly dangerous product. *Elliott v. Brunswick, Corp.*, 903 F.2d 1505, 1507 (11th Cir. 1990). The Alabama Supreme Court elaborated on this requirement in *General Motors Corp. v. Edwards*. 482 So.2d 1176 (Ala. 1985). In that case the court explained,

> In order to prove defectiveness, the plaintiff must prove that a safer, practical, alternative design was available to the manufacturer at the time it manufactured the automobile. The existence of a safer, practical, alternative design must be proved by showing that:
> (a) The plaintiff's injuries would have been eliminated or in some way reduced by use of the alternative design, and that;
> (b) taking into consideration such factors as the intended use of the vehicle, its styling, cost, and desirability, its safety aspects, the foreseeability of the particular accident, the likelihood of injury, and the probable seriousness of the injury if that accident occurred, the obviousness of the defect, and the manufacturer's ability to eliminate the defect, the utility of the alternative design outweighed the utility of the design actually used.

*Id.* at 1191. In a case involving "complex and technical commodit[ies]," such as this, expert testimony is required to prove the defect. *Townsend v. General Motors Corp.*, 642 So.2d 411, 415 (Ala. 1994) (quoting *Brooks v. Colonial Chevrolet-Buick, Inc.*, 579 So. 2d 1328, 1333 (Ala. 19914)).

The Plaintiff bears the burden of proving that the product is defective, as defined above. *Tillman*, 871 So.2d at 32. "Whether a product is 'unreasonably dangerous' is for the trier of fact, just as negligence, vel non, is in a traditional negligence case." *Casrell*, 335 so.2d at 133. However, products "whose inherent danger is patent and obvious do not, *as a matter of law*, involve defects of a sort that a jury should resolve." *Tillman*, 871 So.2d at 32 (quoting *Elliott*, 903 F.2d at 1507).

The *Elliott* court considered a case strikingly similar to the one before this Court. In that case, a fourteen-year-old girl, Ashley Elliott, was injured when she jumped from a pier and was struck by the propeller of a nearby boat. *Id.* at 1505. The court reversed a jury verdict in favor of Ms. Elliott after concluding that the motor, which was also manufactured by Mercury Marine, was not defective because the inherent dangers were apparent and that a propeller guard was not an available alternative design because no feasible guard had been developed. *Id.* at 1505-10. In reaching that decision, the court noted that its holding did not suggest such a feasible

30

design would never be available. *Id.* at 1509.

Subsequently, the Alabama Supreme Court adopted the Eleventh Circuit's reasoning in *Elliot* and concluded that "according to present industry standards, the evidence does not conclusively show that such propeller guards are 'practical.'" *Beech Through Beech v. Outboard Marine Corp.*, 584 So. 2d 447, 450 (Ala. 1991). The court went on to hold that "there is no cause of action, under either the AEMLD or negligence or wantonness theories, for failure to provide propeller guards on pleasure boat outboard motors." *Id.*

Plaintiff contends, as did the appellee in *Elliott*, that a propeller guard was an alternative design available at the time, which Mercury Marine failed to implement on its products. As evidence of this available alternative design, Plaintiff offered a report authored by Keith Jackson, who is the owner of a company that manufactures and sells propeller guards. (Doc. 41-1 at 342.) Mercury Marine questions Mr. Jackson's qualifications to testify as an expert witness and the conclusions he reaches in his report. (Doc. 41 at 14-15.)

Prior to preparing his report, Mr. Jackson inspected the Vessel and the attached Engine at the home of Ms. Kornegay. (Doc. 41-1 at 379.) The conclusions Mr. Jackson reached are summarized at the end of his report. (*Id.* at 384-85.) Among

the conclusions relevant to the Mercury Marine Engine, Mr. Jackson opined that the Engine was "the one element that makes the boat lethal" due to the propeller blades; that Mercury Marine had the capacity to mitigate or eliminate the dangers inherent in propeller strikes for 25 years by restricting top-end speeds; that his propeller guard is practical "for non-performance vessels" and does provide protection from unguarded propeller blades; that the rounded, blunt edges of the propeller guard presented less danger than the sharp propeller blades; and that "if [his] (the Jackson/Swimguard) 'cage type' propeller guard had been offered and installed prior, it would have provided a lifesaving barrier for Madison...." (*Id.*)

In his deposition testimony, Mr. Jackson testified that, in terms of performance, his guard was appropriate for boats traveling at a "maximum of 25 miles an hour and less." (Doc. 41-1 at 338.) He agreed that his guard was not practical for boats traveling at speeds "greater than 15 miles per hour." (*Id.*) Mr. Jackson did not take issue with other expert testing that concluded that the top-end speed for the Vessel in this case was between 15.8 miles per hour when fully loaded and up to 21 miles per hour with only two people on board. (*Id.* at 380.)

Experts for the defense, unsurprisingly, disagree with Mr. Jackson. Dr. Alex Slocum determined that Madison Reed would have been severely injured or killed if

her head had collided with the propeller guard, and the addition of a propeller guard would act as an extension of the boat, increasing the size of the obstacle in a collision. (*Id.* at 414.)  Another expert, William Daley, P.E., conducted on-the-water testing of the Vessel and attached Engine and concluded that the Vessel's top-end speed when loaded was 15.8 miles per hour; propeller guards are not appropriate mitigation devices for boats traveling at 10 miles per hour or faster; and a propeller guard would not have been appropriate for the Vessel in this case. (*Id.* at 456-57.)

Considering these materials, as it must, in the light most favorable to the Plaintiff, the Court finds that a question of fact remains as to whether propeller guards are practical in this case. Both *Beech* and *Elliott* were decided in 1991, and both decisions acknowledged the possibility for evolving standards to change what is practical. *Beech*, 584 So.2d at 550 ("We also note that, *according to present industry standards*, the evidence does not conclusively establish that such propeller guards are 'practical.'" (emphasis added)); *Elliott*, 903 F.2d at 1509 ("We do not mean to suggest, by our holding today, that the propeller industry may never design a feasible propeller guard…."). Given that possibility, this Court cannot affirmatively say that no propeller guard existed that would be a safer, practical, alternative design. Because a question of fact remains for the jury to decide, Mercury Marine's motion

33

for summary judgment on Plaintiff's AEMLD claim is due to be denied.

### 3. Contributory Negligence

Mercury Marine also argues that Plaintiff's AEMLD and negligence claims cannot survive its motion for summary judgment because Madison Reed's contributory negligence bars any recovery in this case. (Doc. 41 at 27-30.) The Court disagrees.

Under the AEMLD, unlike pure no-fault products liability claims, the affirmative defenses of contributory negligence, assumption of risk, and, in some situations, lack of causal connection, persist. *McClain v. Metabolife Intern., Inc.*, 193 F.Supp.2d 1252, 1256 (N.D. Ala. 2002). If the plaintiff's own actions contributed to his injury, contributory negligence acts as a complete bar to recovery, even if the plaintiff shows that the defendant was at fault. *Alabama Power Co. v. Scholz*, 283 Ala. 232, 238 (Ala. 1968).  To establish contributory negligence, the defendant must show that the plaintiff "(1) had knowledge of the dangerous condition, (2) appreciated the danger under the surrounding circumstances, and (3) acted unreasonably given his knowledge and appreciation." *Goree v. Winnebago Industries, Inc.* 958 F.2d 1537, 1543 (11th Cir. 1992) (citing *Caterpillar Tractor Co. v. Ford*, 406 So.2d 854, 857 (Ala. 1981).

While children between the ages of 7 and 14 years are *prima facie* incapable of contributory negligence, a showing that the child possesses the "discretion intelligence, and sensitivity to danger which an ordinary 14-year-old child possesses" may overcome the presumption. *Smith v. Bradford*, 475 So.2d 526, 529 (Ala. 1985). In making this determination, courts must consider seven elements: (1) intelligence; (2) capacity to understand the potential danger; (3) actual knowledge of the danger; (4) ability to exercise discretion; (5) educational level; (6) maturity; and (7) age. *Jones ex rel. Jones v. Power Cleaning Contractors*, 551 So. 2d 996, 999 (Ala. 1989).

At the time of the Accident, Madison Reed was fourteen years old. (Doc. 1-1 at 7.) She was in the ninth grade and a member of the Junior Honor Society and the ROTC.  (Doc. 41-1 at 210.) By all accounts, she was a smart, disciplined, and respectful girl who followed instructions. (*See e.g., id.* at 115, 135, 210, 509.) Even so, some question remains as to whether Ms. Reed actually received a warning about the dangers of sitting on the bow deck when it was underway or appreciated the danger, especially because Mr. and Mrs. Jones permitted her and her friends to sit there immediately before the accident. (*See id.* at 72-73, 100-01, 103, 106, 137.) Because a question of fact remains as to Madison Reed's actual knowledge and appreciation of the danger, this Court will not grant Mercury Marine's motion for summary

35

judgment on this ground.

### C. Tracker's Motion for Summary Judgement

Plaintiffs have also brought claims against Tracker under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD") alleging that the Vessel was unreasonably dangerous, that Tracker failed to provide adequate warning and to equip the Vessel with an available safety device. (Doc 1-1 at 4-15.) The complaint also sets forth claims against Tracker for negligence and wantonness for the same conduct, attractive nuisance, and breach of implied warranties of merchantability and fitness for a particular purpose. (*Id.*) Defendant Tracker has moved for summary judgment on all claims. (Doc. 42.)

### 1. AEMLD: Unreasonably Dangerous Product and Failure to Attach an Available Safety Device

As discussed above, to establish a claim under the AEMLD, Plaintiff bears the burden of showing that the Vessel was defective, or unreasonably dangerous, such that it did not conform to the expectations of the ordinary consumer when put to its intended purpose, and that a safer, alternative design was available. *Beam*, 655 So. 2d at 981; *Elliott*, 903 F.2d at 1507.

Tracker argues that Madison Reed violated Alabama's careless boating statute, and thus her claim is barred because of her contributory negligence per se

36

and misuse of the product. (Doc. 43 at 17-20.) They also assert that Plaintiff cannot make out a claim because the dangers were open and obvious and because there is no evidence of a safer alternative design without changing the nature of the Vessel to be a different product altogether. (*Id.* at 23-28.) Nor does Tracker believe that Plaintiff can establish liability based on a lack of proximate cause, arguing that the actions of Carson Hunnicutt and Daniel Jones were intervening and superseding actions that broke the chain of causation. (*Id.* at 28-30.)

### a. Contributory Negligence Per Se

Tracker asserts in its motion for summary judgment that, as a matter of law, Madison Reed is barred from recovery based on her failure to comply with an Alabama boating regulation, which makes it "unlawful to operate a vessel in a careless manner" and cites as examples "[r]iding on the bow of a vessel not equipped with handrails" and "[r]iding on a vessel with lower extremities hanging over the gunwale or cap of the vessel." *Boating Rules and Regulations*, ALA. L. ENF'T AGENCY, [hereinafter "*Boating Rules*"] https://www.alea.gov/dps/marine-patrol/boating-rules-and-regulations (last visited Nov. 30, 2021).

As discussed above, the defense of contributory negligence is available when the defendant makes a showing that the plaintiff "(1) had knowledge of the

dangerous condition, (2) appreciated the danger under the surrounding circumstances, and (3) acted unreasonably given his knowledge and appreciation." *Goree v. Winnebago Industries, Inc.* 958 F.2d 1537, 1543 (11th Cir. 1992) (citing *Caterpillar Tractor Co. v. Ford*, 406 So.2d 854, 857 (Ala. 1981). Negligence per se, however, requires the following elements:

> (1) The statute must have been enacted to protect a class of persons, of which the plaintiff is a member; (2) the injury must be of the type contemplated by the statute; (3) the [the party charged with negligence per se] must have violated the statute; and (4) the … statutory violation must have proximately caused the injury.

*Parker Bldg. Servs. Co. v. Lightsey ex rel. Lightsey*, 925 So. 2d 927, 931 (Ala. 2005) (quoting *Fox v. Bartholf,* 374 So.2d 294, 295 (Ala.1979)).

As to the first element, as noted above, the Alabama Boating Rules and Regulations (the "Rules and Regulations") include among them a prohibition on careless operation, including riding on a deck unenclosed by handrails and riding with lower extremities hanging over the gunwale or cap. *Boating Rules*. The Rules and Regulations also define "careless operation" as "the endangerment of life, limb, or property through negligence, carelessness, or inattention of the operator." By

38

prohibiting such behavior, the purpose is clearly to prevent such endangerment of life, limb, or property. The threat to Madison Reed's life was precisely the type of injury contemplated by the Rules and Regulations. Furthermore, Plaintiff admits that Madison Reed was riding on the unenclosed bow deck at the time of the accident. (Doc. 1-1 at 8.)

Still, the question of proximate cause remains. "The question of proximate cause is almost always a question of fact to be determined by the jury. The question must go to the jury if reasonable inferences from the evidence support the theory of the complaint." *Marshall County v. Uptain*, 409 So.2d 423, 425 (Ala. 1981) (internal citations omitted).  Tracker argues that Madison Reed's violation of the statute by riding on the unenclosed bow deck was the proximate cause of her fatal injuries (doc. 43 at 17-20), while Plaintiff asserts that the defective design of the boat was the proximate cause (doc. 46 at 4-7). Plaintiff's argument rests on the theory that had the deck been enclosed, Madison Reed would not have fallen overboard. (*See id.*)

Plaintiff has presented the expert report of Dr. Brandon Taravella as well as his deposition testimony. (Doc. 41-1 at 284-330, 387-94.) In both his report and his deposition testimony, Dr. Taravella criticized the Vessel's design and offered alternative design configurations to minimize the safety hazards he identified. (*See,*

*e.g.*, Doc. 41-1 at 387-394.) Defense experts counter that use of the bow while the boat was underway was the cause of the Accident and that no alternative design would have been safer. (*See id.* at 414, 457, 483.) Interpreting the evidence available in the light most favorable to the Plaintiff, the Court concludes that a question of fact as to the proximate cause of the accident remains for the jury to resolve.

### b. Product Misuse

Tracker also asserts that Plaintiff's AEMLD claim fails because Daniel Jones and Madison Reed used the Vessel in a manner not intended by the manufacturer. "The important factor," when determining whether a product is defective or unreasonably dangerous, "is whether it is safe or dangerous when the product is used as it was intended to be used." *Casrell*, 335 So.2d 128, 133 (Ala. 1976).

To rebut this argument, Plaintiff relies on a decision by the Alabama Supreme Court discussing the defense of product misuse. *Dennis By & Through Dennis v. Am. Honda Motor Co.*, 585 So. 2d 1336, 1339 (Ala. 1991). The court held that "contributory negligence relating to accident causation will not bar a recovery in an AEMLD action. Lack of causal relation, product misuse, and assumption of risk are still valid defenses to an AEMLD action." *Id.* at 1342. The court referred to specific cases to help distinguish the form that some of these different theories can take. It

noted that in *Caterpillar Tractor Co. v. Ford*, 406 So.2d 854 (Ala. 1981), an assumption-of-risk defense required a showing that the Plaintiff "appreciated the danger under the surrounding circumstances and … acted unreasonably with that knowledge and appreciation." By contrast, in *Harley-Davidson, Inc. v. Toomey*, 521 So.2d 971 (Ala. 1988), the court found that a motorcyclist did not misuse his helmet because he wore it properly with all of the snaps fastened and because there was no other evidence to indicate that he did not exercise reasonable care in wearing the helmet.

In *Campbell v. Robert Bosch Power Tool Corp.*, the court interpreted the decision in *Dennis* to mean that "a plaintiff's contributory negligence in causing an accident was not a defense to an AEMLD action, but that his contributory negligence in the use of the product was." 795 F.Supp. 1093, 1097. The court lamented the fact that the Alabama Supreme Court did not further define product misuse, noting that different courts have interpreted "misuse" to refer to (1) "use of a product in a manner not reasonably foreseen by the defendant" rather than "one's carelessness or inadvertence in the use of the product"; (2) "a use neither intended by the defendant nor reasonably foreseeable"; or (3) "any unintended or abnormal use of a product," but finding that only unforeseeable misuse barred recovery. *Id.* at 1097-

41

98.

Under any of these definitions, Madison Reed's alleged misuse of the Vessel would not be a viable defense. The first and second definitions account for misuse that was not reasonably foreseeable. The third definition deals with "unintended or abnormal uses" but only bars recovery when the unintended use is unforeseeable. Tracker, however, certainly anticipated such misuse because it warned against it. (Doc. 41-1 at 393.)

The defendant in *Campbell* tried a similar tactic, which the court rejected. "In effect, … [Defendant's] misuse defense is premised on the warning label itself, the very warning that [Plaintiffs] argue was inadequate. When viewed within the parameters of an AEMLD failure-to-warn claim, [Defendant's] misuse defense is no more than an argument, in another guise, that the warning … was adequate." *Campbell*, 795 F.Supp. at 1098. The court further explained,

> An inadequate warning does not put a consumer on notice of its message and failure to obey an "unreasonable" warning cannot be evidence of an improper use. In either case, therefore, to allow [Defendant] to rely on the label, whose sufficiency as a warning is disputed, as evidence that [Plaintiff] "misused" the [product] would be redundant.

*Id.* at 1099.

As was the case in *Campbell*, the warnings provided by Tracker are challenged

42

by Plaintiff as inadequate. Tracker cannot claim to have provided adequate warning of the danger to Madison Reed and simultaneously assert that it did not foresee the danger of using the Vessel in the manner that it warned against.

Additionally, Daniel Jones, a licensed and experienced boater and fisherman, was operating under a different definition of the term "underway" at the time of the Accident. (Doc. 41-1 at 133.) He understood the term to mean that "the throttle [was] engaged and a wake possible behind the boat." (*Id.*) The ABYC definition for "underway," however, referred to "a vessel not at anchor, or held fast to the shore, or aground." (Doc. 41-1 at 392.) As raised by Dr. Taravella in his report and his deposition testimony, it is clear that even an experienced user may have some confusion about the exact meaning of the term "underway" as used in the warnings and might not understand their behavior to be a misuse or unintended use of the product. (*Id.* 41-1 at 390, 311, 316, 394.) Furthermore, as Dr. Taravella notes in his report, the warning on the bow gate advises against "sit[ting] in the fishing chairs or stand[ing] forward of the chairs while the boat is underway," but Ms. Reed engaged in neither of those activities. (*Id.* at 394.) She was sitting, not standing, and she was seated on the deck itself, not in one of the fishing chairs. (*Id.* at 86, 136.) Given these potential points of confusion, a reasonable jury might find that Madison Reed did not

43

misuse the product.

For the reasons outlined above, Tracker's argument that Madison Reed's alleged misuse bars her recovery fails.

### c. Open and Obvious Danger

Tracker argues that any danger presented by the Vessel was not unreasonable, and thus the Vessel was not defective, because it was open and obvious. (Doc. 43 at 23-25.) Much like Mercury Marine in its argument that the Engine was not unreasonably dangerous, Tracker relies on the court's reasoning in *Elliott* to assert that, as a matter of law, the danger of falling from the Vessel and suffering injury from the Engine was open and obvious. (*Id.*)

"A condition is 'open and obvious' when it is 'known to the [plaintiff] or should have been observed by the [plaintiff] in the exercise of reasonable care.'" *Denmark v. Mercantile Stores Co.*, 844 So. 2d 1189, 1194 (Ala. 2002) (quoting *Quillen v. Quillen,* 388 So.2d 985, 989 (Ala.1980)).    Tracker asserts that each of the occupants on the Vessel the day of the accident testified that they were aware of the danger of falling off and being struck by the propeller. (Doc. 43 at 24 citing Doc. 41-1 at 80-81, 169-70, 190, 226.) However, at the time of the accident, Mr. and Mrs. Jones allowed the Teenagers to sit on the unenclosed bow deck. (Doc. 41-1 at 137.)

44

Reasonable minds could differ as to whether such approval by the responsible adults might lead a teenager to conclude that her behavior presented no danger under the circumstances. Furthermore, as Plaintiff notes in his brief, Madison Reed was seated at the bow deck at the opposite end of the boat from the Engine. (Doc. 46 at 20; *see also* Doc. 41-1 at 389.) Nothing in the record indicates she had inspected the configuration of the pontoons in relation to the Engine on the underside of the boat or considered the way that configuration could present a risk to someone who fell from the bow deck.  Moreover, as discussed in the preceding section, the confusion over the term "underway" and what behaviors posed the dangers warned against further underscores how the danger was not "open and obvious."

The Court finds that a question of fact remains as to whether Madison Reed should have known of the danger that falling from the Vessel entailed. Therefore, Tracker's argument that the danger was "open and obvious" fails.

### d.  Safer Alternative Design

Tracker asserts that Plaintiff cannot make out an AEMLD claim because he cannot show evidence of a safer alternative design that is, in fact, an alternative rather than a different product altogether. (Doc. 43 at 25-28.) As the court held in *Beech*, the safer alternative design must eliminate or reduce the plaintiff's injuries, and after

accounting for factors including "the intend use…, its styling, cost, and desirability, its safety aspects, the foreseeability of the particular accident, the likelihood of injury, and the probable seriousness of the injury if that accident occurred, the obviousness of the defect, and the manufacturer's ability to eliminate the defect," the utility of the alternative design must outweigh the utility of the design used. *Beech*, 584 So.2d at 450. Furthermore, Plaintiff must establish a practical, safer, alternative design, "not a design for a different, albeit similar, product, even if it serves the same purpose." *Hosford v. BRK Brands, Inc.*, 223 So. 3d 199, 208 (Ala. 2016).

Plaintiff has presented a report by Dr. Brandon Taravella setting forth several alternative designs: (1) "enclose[ing] the <u>entire</u> weather deck by the deck rail system that is at least 24" high above the deck;" (2) "adding a third pontoon on centerline so the fallen passenger would be forced to the side and not directly into the lower unit of the engine;" (3) "providing twin engines, [sic] behind each ponto[o]n so that the fallen passenger would not be directed directly into the lower unit of the engine; and/or" (4) "add[ing] a propeller guard to the lower unit to prevent the fallen passenger from coming in contact with the rotating propeller." (Doc. 41-1 at 389-90.) Tracker, relying on the Alabama Supreme Court's decision in *Hosford*, asserts

46

that each of these designs would change the functionality of the product so that, even if they may serve the same purpose, they are ultimately designs for different products. (Doc. 43 at 25-28.)

In *Hosford*, the Alabama Supreme Court determined that ionization smoke alarms and dual-sensor smoke alarms were similar, but ultimately different products, and therefore, the defendant, BRK Brands, Inc., was entitled to judgment as a matter of law on the plaintiff's AEMLD claim. *Hosford*, 223 So.3d 199, 208 (Ala. 2016). The court quoted extensively from a Texas Court of Appeals opinion dealing with a case in which the plaintiff argued that Prempro, a drug combination of estrogen and progestin used to treat menopausal symptoms, was defective and that a safer alternative design was a drug that contained only estrogen. *Id.* at 205-06. The defendant pharmaceutical company argued that estrogen was not a safer alternative, but a different product, which it already marketed and sold as Permarin. *Id.* The Texas Court of Appeals, quoting a decision by its Supreme Court, explained,

> A motorcycle could be made safer by adding two additional wheels and a cab, but then it is no longer a motorcycle. A convertible can be made safer by fully enclosing the cab, but then it is just an ordinary car. The law of products liability demands that manufacturers and distributors take feasible steps to make their products reasonably safe. It is not rational, however, to impose liability in such a way as to eliminate whole categories of useful products from the market.

47

*Brockert v. Wyeth Pharmaceuticals, Ind.*, 287 S.W.3d 760, 770 (Tex. App. 2009) (quoting *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 385 (Tex. 1995)).

In both *Hosford* and *Brockert*, the defendant manufacturer already sold a version of the design proposed by Plaintiff as a different product. *Hosford*, 223 So.3d at 204-05. Tracker asserts that it similarly sold "a pontoon boat nearly identical to the Vessel in this case but without an unenclosed Bow Deck at the time this Vessel was manufactured." (Doc. 43 at 27, emphasis omitted.) Even if the Court rejected Dr. Taravella's proposal of enclosing the bow deck as a different product rather than alternative design, Dr. Taravella has proposed other options, and Tracker has presented no evidence that those other proposals would change the functionality or the nature of the product.

Countering Dr. Taravella's suggestion to enclose the bow deck of the Vessel (doc. 41-1 at 321), Tracker argues that the purpose of the bow deck remaining open is to facilitate fishing and that enclosing the bow deck would frustrate that purpose and fundamentally change the nature of the Vessel (doc. 43 at 25-28). Dr. Taravella, when confronted with this assertion, explained why he disagreed:

> Q. … Would you agree that fully enclosing the bow of the boat would change the functionality of the boat?
> A. No.
> Q. You don't think that it would make it more difficult to fish from the

bow chairs?
A. No, ma'am. The bow chairs --
…
A. The height of the bow chairs is approximately at the level of the rail.
I mean, the current design, I think, since 2012, includes fishing chairs
that are behind the bow rail.

(Doc. 41-1 at 321.)

Dr. Taravella's final suggestion was to add a propeller guard. (Doc. 41-1 at 390.) As discussed in the context of Mercury Marine's motion for summary judgment, the *Elliott* and *Beech* opinions on the viability of propeller guards as safer alternative designs were authored in the 1990s and considered the possibility of advancements in technology. *Beech*, 584 So.2d at 550; *Elliott*, 903 F.2d at 1509. Both of Plaintiff's experts now assert that a propeller guard would be a practical, safer alternative design. (Doc. 41-1 at 385, 389.)

Plaintiff has presented evidence of alternative designs.  Whether those designs are practical and safe or change the fundamental nature of the Vessel are questions for the jury. This Court finds that Plaintiff has provided sufficient evidence of alternative designs to survive Tracker's motion for summary judgment.

### e.  Proximate Cause

Tracker's final argument in favor of summary judgment on Plaintiff's AEMLD claim is that Plaintiff cannot establish proximate cause because the actions

of Daniel Jones and Carson Hunnicutt were intervening and superseding actions that disrupted the chain of causation. Tracker asserts that Carson Hunnicutt's "hand motion" caused Madison reed to "los[e] her balance and [go] into the water." (Doc. 41-1 at 218.) Tracker also cites an admission by Daniel Jones that he had been drinking and that he allowed the Teenagers to ride on the bow deck on the day of the accident despite knowing that it was against Alabama law. (Doc. 43 at 29 n.12; *see also* Doc. 41-1 at 137.) The actions of Hunnicutt and Daniel Jones, Tracker argues, were intervening acts absolving Tracker of any liability. (Doc. 43 at 28-29.) The Court disagrees.

As previously discussed, a lack of proximate cause may be a defense to an AEMLD claim. *Dennis*, 585 So. 2d at 1342 (Ala. 1991) ("Lack of causal relation, product misuse, and assumption of risk are still valid defenses to an AEMLD action."). In order to establish liability, "there must be not only some causal connection between the negligent act complained of and the injury suffered, but also the connection must be by a natural and unbroken sequence, without intervening, efficient causes, so that, but for the negligence of the defendant, the injury would not have occurred." *City of Mobile v. Havard*, 268 So. 2d 805, 810 (Ala. 1972).

> Where it is determined that some prior negligent act merely created the
> condition or gave rise to the occasion and after the creation of said

> condition an intervening, independent agency produces an injury, the party guilty of the first negligent act is not liable because his negligence was but a remote cause of the injury.

*Id.* (citing *Louisville & N.R. Co. v. Maddox*, 13 So. 849 (Ala. 1938)). Thus,

> in order for conduct to be an intervening cause insulating the defendant from liability, the conduct must (1) occur after the defendant′s actions giving rise to the negligence claim, (2) be unforeseeable to the defendant at the time the defendant acts, and (3) be sufficient to be the sole proximate cause of the plaintiff′s injury.

*Miller v. Cleckler*, 51 So. 3d 379, 384 (Ala. Civ. App. 2010). Absent an intervening cause, "one is held legally responsible for all consequences which a prudent and experienced person, fully acquainted with all the circumstances, at the time of his negligent act, would have thought reasonably possible to follow that act, including the negligence of others." *General Motors Corp. v. Edwards*, 482 So.2d 1176, 1194 (Ala. 198).

This Court does not consider the actions of Carson Hunnicutt or Daniel Jones to be intervening and superseding causes of Madison Reed's death. If the jury finds that the design of the Vessel was defective and some safer alternative design would have prevented Madison Reed from either falling overboard or suffering fatal injuries as a result, then the actions of Carson Hunnicutt and Daniel Jones would not be sufficient on their own to cause the injury. Moreover, as already discussed, Tracker

51

cannot claim that Teenagers riding on the bow deck was unforeseeable because it warned against such behavior. The alleged negligence on the part of Carson Hunnicutt and Daniel Jones should also have been foreseeable by Tracker. For these reasons, Tracker's motion for summary judgment is denied.

### 2. AEMLD: Failure to Warn

To establish a claim for failure to adequately warn, the plaintiff bears the burden of showing "(1) the defendant had a duty to warn the plaintiff regarding the danger when the product is used in its intended or customary manner, (2) the warning the defendants provided breached that duty because it was inadequate, and (3) the breach proximately caused the plaintiff's injuries." *Jackson v. E&R Mfg. Co.*, No. CIV.A2:06CV412WHA, 2007 WL 2806831, at *6 (M.D. Ala. Sept. 25, 2007).

Tracker included warnings in its owner's manual: "**DO NOT** sit on pedestal style fishing seats or any other seat intended for fishing while the boat is underway." and

> All passengers should be carefully seated to prevent them from being thrown overboard or injured from falling in the boat. Passengers must never ride on elevated fishing seats, seat backs or outside the perimeter of the fence while the boat is underway. Passengers riding on the bow rider seats (if equipped) should use extreme caution. During rough water operation, passengers should be seated on the floor of the boat

near the center.

(Doc. 44 at 80, 34.) Another warning was also located on the bow gate next to the latch: "WARNING: To avoid falling overboard and propeller injury resulting in serious injury or death do not sit in fishing chairs or stand forward of chairs while boat is underway." (Doc. 45 at 31.) Again, as noted in Dr. Taravella's report, Madison Reed was not engaged in either of these specific behaviors at the time of the Accident. (Doc. 41-1 at 394, 86, 136.)

Tracker argues that Plaintiff cannot establish that it had a duty to warn or that any inadequacy of warning was the proximate cause of Madison Reed's death because she, along with the other occupants of the Vessel, was subjectively aware of the danger. (Doc. 43 at 30.) Tracker further argues that Plaintiff has not presented any evidence that Madison Reed actually read the warnings provided by Tracker, and therefore, any inadequacy in the warnings could not have caused her death. (Doc. 43 at 31-32.)

Plaintiff argues that even if other occupants of the Vessel were aware of the dangers, a question as to what dangers Madison Reed recognized remains unanswered. (Doc. 46 at 34-38.) Plaintiff points to *Hicks v. Commercial Union Ins. Co.* to rebut Tracker's argument that Madison Reed's subjective knowledge of the

53

danger obviated any need for an adequate warning. (*Id.* at 34-35.) In *Hicks*, the plaintiff's decedent was killed when a pipe stopper became dislodged and struck him in the head during a hydrostatic test, and defendants had warned of the danger of standing in front of the pipe stopper during the test. *Hicks v. Com. Union Ins. Co.*, 652 So. 2d 211, 214 (Ala. 1994). The court offered the following explanation as part of its rationale for finding that a reasonable jury could determine that the pipe stopper was defective:

> Although the testimony of the … employees raises an inference that the danger posed by a pipe stopper's slipping loose was commonly known, that evidence does not create an undisputed inference that users of the pipe stopper knew that mismatching the jaws of the pipe stopper would greatly increase the propensity of the pipe stopper to dislodge during a hydrostatic test."

*Id.* at 217. The Alabama Supreme Court did not consider common knowledge about a general danger to be evidence of subjective knowledge by the user of the increased danger he encountered due to the alleged defect. *Id.* Even if Madison Reed was aware that falling overboard was dangerous, it is not at all clear that she was subjectively aware of the nature of the actual threat she faced by falling off the Vessel as designed. Madison Reed's subjective awareness of the dangers presented cannot be established by the evidence of what the other occupants of the boat knew.

Tracker also argues that even if its warning was not adequate, Plaintiff cannot

establish proximate causation because there is no evidence that Madison Reed read any of the warnings Tracker provided. (Doc. 43 at 31-32.) Plaintiff rebuts this argument with *E.R. Squibb & Sons, Inc. v. Cox*, in which the Alabama Supreme Court acknowledged that such an argument does not apply "where plaintiff alleges that the warning is inadequate with respect to prominence." *E.R. Squibb & Sons, Inc. v. Cox*, 477 So. 2d 963, 970 (Ala. 1985) (citing *Spruill v. Boyle-Midway, Inc.*, 308 F.2d 79, 87 (4th Cir. 1962) (where the warning provided had not been "calculated to attract the user's attention, due to its position, size, and the coloring of its lettering, and… words used therein … to convey a conception of the true nature of the danger")). The court went on to explain that in such a situation, "the very nature of the alleged breach is such that it causes a potential plaintiff to fail to read the warning which causes his injury," even if worded in such a way as to apprise the user of the product's "particular danger." *Id.*

Plaintiff argues that the bow deck was accessible without opening the latch by either stepping over the gate or by entering from the loading dock. (Doc. 46 at 3.) Dr. Taravella also took issue with the placement of the label on the gate, noting that it was only 13 inches above the deck on the lower portion of the gate and not visible to someone actually sitting or standing on the bow deck. (Doc. 41-1 at 317-18, 394.) Dr.

Taravella's report also complained that the label did not warn against the specific activity that Madison Reed was engaged in because she was not sitting in one of the fishing chairs or standing in front of them. (*Id.* at 394.) Acknowledging these questions about the adequacy of the warning's prominence, in addition to its content, the Court finds that a genuine issue of fact remains for the jury to determine whether Tracker provided adequate warning, and therefore, its motion for summary judgment on this claim is denied.

### 3. Negligence and wantonness

To prevail on the negligence claim, Plaintiffs must prove: "(1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury." *Hilyer v. Fortier*, 227 So.3d 13, 22 (Ala. 2017) (quoting *Lemley v. Wilson*, 178 So.3d 834, 841-42 (Ala. 2015)). Plaintiff's allegation of negligence and wantonness is based on the same conduct as alleged in its claims under the AEMLD. For the same reasons that the Court determined that there were genuine questions of material fact as to proximate causation under those claims, the Court denies Tracker's motion for summary judgment on the claims for negligence and wantonness.

### 4. Attractive Nuisance

56

　
Plaintiff's complaint alleges that the bow deck of the Vessel "created an attractive nuisance, inviting plaintiff's decedent onto the bow." (Doc. 1-1 at 8.) The doctrine of attractive nuisance "offers an exception to the limited duty owed by a landowner to a trespasser. It applies only where trespassing children are involved." *Tolbert v. Gulsby*, 333 So. 2d 129, 132 (Ala. 1976) (citing *Alabama Great Southern Railroad Co. v. Green*, 159 So.2d 823 (Ala. 1964)). As Tracker notes in its brief, the doctrine does not apply to the facts of this case. (Doc. 43 at 32.) Madison Reed was a guest of the Jones family on the Vessel; she was not a trespasser. (*See* Doc. 41-1 at 177.) Nor is Tracker a landowner in any way that is relevant to this case. Because the doctrine does not apply on these facts, Tracker's motion for summary judgment is due to be granted as to Count One.

### 5. Breach of Implied Warranties of Merchantability and Fitness for a Particular Purpose

Plaintiff's final allegation against Tracker is that it breached implied warranties of merchantability and fitness for a particular purpose. (Doc. 1-1 at 12.) Tracker makes little effort to rebut the allegation, except to argue that Plaintiff's warranty claims are subsumed under its AEMLD claims in this case and will accordingly, "succeed or fail on the same bases." (Doc. 43 at 20 n.10.) Plaintiff does not even mention the warranty claims in his response. However, as the Court stated

in regard to Mercury Marine's motion for summary judgment on this count, the Supreme Court of Alabama has held that only sellers, not manufacturers, are subject to implied warranties under its version of the UCC. *Ex parte Gen. Motors Corp.*, 769 So. 2d 903, 910 (Ala. 1999). As there is no dispute that Tracker manufactured but did not sell the Vessel in this case, the Court grants Tracker's motion for summary judgment on Count Six.

## IV.   CONCLUSION

For the reasons stated above, Tracker's motion (doc. 54) to exclude expert testimony and reports of Plaintiff's expert Keith Jackson is due to be GRANTED and as to Dr. Brandon Taravella is due to be DENIED, Defendant Mercury Marine's motion for summary judgment (doc. 40) is due to be GRANTED as to the claims alleging failure to warn and breach of implied warranties and DENIED as to the AEMLD and negligence and wantonness claims, and Defendant Tracker's motion for summary judgment (doc. 42) is to be GRANTED as to the attractive nuisance and breach of implied warranty claims and DENIED as to the AEMLD, failure to warn, and negligence and wantonness claims. An Order consistent with this Opinion will be entered contemporaneously herewith.

58

**DONE** AND **ORDERED** ON DECEMBER 7, 2021.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

206728